**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | | |
|---|---|---|
| **NEWCSI, INC.,** | § | |
| | § | |
| v. | § | A-14-CV-557-LY |
| | § | |
| **STAFFING 360 SOLUTIONS, INC.** | § | |

**REPORT AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE**

TO:   THE HONORABLE LEE YEAKEL
      UNITED STATES DISTRICT JUDGE

Before the Court are Plaintiff NewCSI, Inc.'s Motion for Summary Judgment (Dkt. No. 12); and Defendant's Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment (Dkt. No. 13). The undersigned submits this Report and Recommendation to the United States District Court pursuant to 28 U.S.C. § 636(b) and Rule 1(h) of Appendix C of the Local Court Rules of the United States District Court for the Western District of Texas, Local Rules for the Assignment of Duties to United States Magistrate Judges.

**I.      Background**

This is a breach of contract case. Plaintiff NewCSI, Inc., ("NCSI") is a Delaware corporation headquartered in Austin, Texas. Defendant Staffing 360 Solutions, Inc., ("Staffing 360") is a Nevada corporation headquartered in New York City, New York. Staffing 360 removed the case based on diversity jurisdiction, after NCSI filed the suit in Travis County. This case derives from Staffing 360's acquisition of Control Solutions International, Inc., accomplished when Staffing 360 purchased 100% of the outstanding shares of CSI from NCSI—an entity created for the transaction—pursuant to the terms of the Stock Purchase Agreement ("SPA") dated August 14, 2013. *See* Dkt. No. 12-2.

Staffing 360 is a public company in the international staffing sector. Dkt. No. 13-2, Mitchell Affidavit, ¶ 10. NCSI was formed for the purpose of the transaction in which Staffing 360 acquired CSI. *Id.* at ¶ 14. After the Closing, CSI became Staffing 360's wholly-owned subsidiary. *Id.* at ¶ 25. After Staffing 360 acquires a subsidiary, the subsidiary generally continues to operate as an independent company, with its own management, accounting staff, software, and is responsible for maintaining its own books and records. *Id.* at ¶ 12. NCSI has three shareholders, Charles Cooper, Simon Dealy, and Margaret Gesualdi ("NCSI Shareholders"). The closing date for the acquisition was November 4, 2013, (the "Closing Date"), at which time Staffing 360 paid NCSI $3,530,454 in cash and stock options to acquire NCSI. *Id.* at ¶ 17. At the Closing Date, Staffing 360 also entered into an employment agreement with each of the three NCSI Shareholders, whereby each became an employee of Staffing 360 and an Officer of CSI. Under their employment agreements, the three NCSI shareholders manage and control CSI's operations. *Id.* at ¶ 17. The agreements are for four year terms.

In its First Amended Complaint, NCSI asserts that Section 2.7 of the SPA required Staffing 360 to determine the value of CSI's "Deferred Tax Assets," as defined in that provision, within 90 days after December 31, 2013 (*i.e.*, no later than March 31, 2014). Section 2.7 of the SPA reads:

> 2.7   <u>Deferred Tax Asset</u>. Within 90 days after December 31, 2013, the Purchaser shall reasonably finalize the dollar value of Deferred Tax Assets as of the Closing Date that have accrued or will benefit in the future to CSI or the Purchaser as a result of the Purchaser's acquisition of CSI (the "Deferred Tax Benefit") and without regard as to whether or not such Deferred Tax Asset has been or can be used in the current tax year or is deferred to a future tax year. Fifty percent (50%) of the Deferred Tax Benefit shall be paid in cash to NCSI on the next scheduled Earn Out payment date following the completion of such determination.

Any payment to NCSI was due on or before April 20, 2014.[1] NCSI asserts that Staffing 360 failed to make the calculation, and failed to send the payment, and that both failures constitute a breach of the SPA. Dkt. No. 20, ¶ 7.

In ¶ 2.2(d) of the SPA, the parties agreed that certain events would be considered "Adjustment Events," triggering an obligation for 360 Staffing to make a specifically defined payment to NCSI. The relevant language of the SPA states:

> The Purchaser acknowledges and agrees that the following events ("Adjustment Events") may have a negative impact on CSI and CCSI's consolidated Gross Profit. The Purchaser further acknowledges that the actual damages likely to result from an Adjustment Event are difficult to estimate on the date of this Agreement and would be difficult for NCSI or the Shareholders to prove.

Dkt. No. 12-2 at ¶ 2.2(d). The section goes on to provide that four particular events would obligate Staffing 360 to make a $1.4 million payment, and all others required a $2 million payment. *Id.* In either case, the payment due would be net of any payments made under the "Earn Out" portion of the SPA. One of the four events triggering a $1.4 million payment is "[t]he failure of the Purchaser to perform, keep or observe any term, provision, condition, covenant, warranty or representation contained in this Agreement." *Id.* at ¶ 2.2(d)(ii). NCSI contends that Staffing 360's failure to calculate and pay the Deferred Tax Assets is an Adjustment Event, entitling NCSI to not only the amount due for the Deferred Tax Assets, but also payment of the accelerated "Adjustment Amount" set out in ¶ 2.2(d).

Staffing 360 maintains that it did in fact perform the required calculation on time, and the calculation determined that Staffing 360 owed nothing to NCSI, but that NCSI disagreed with its calculation. Staffing 360 argues that questions of fact exist as to what amount, if any, was due for Deferred Tax Asserts, and whether its initial computation met the requirement that it "reasonably

---

[1] In some places the parties identify the relevant date as April 15, 2014, and in other places as April 20, 2014.

finalize" the amount due by March 31, 2014, as required by SPA ¶ 2.7. It argues that under its reading of the SPA it met its obligations and NCSI cannot prove a breach. Dkt. No. 13 at 1.

In addition, Staffing 360 maintains that NCSI failed to cooperate in its calculation of the "Deferred Tax Assets." It surmises that NCSI did not want Staffing 360's calculation at all, because NCSI knew the amount owed would be minimal, while an "Adjustment Payment" for failure to comply with the SPA would be sizeable. Staffing 360 also asserts that SPA ¶ 2.7 is ambiguous in several respects, and performance of SPA ¶ 2.7 was frustrated and prevented by NCSI's lack of cooperation. Staffing 360 also points out that, despite NCSI's suggestion that the calculation of the Deferred Tax Assets was straightforward and Staffing 360's liability clear, NCSI failed to offer any evidence in its summary judgment motion of what in fact was the amount due for Deferred Tax Assets on March 31, 2014.

## II. Summary Judgment Standard

When a party moves for summary judgment, the reviewing court shall grant the motion "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED.R.CIV.P. 56(a). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts on questions of fact must be resolved in favor of the party opposing summary judgment. *See Evans v. City of Houston*, 246 F.3d 344, 348 (5th Cir. 2001) (citation omitted).

## III. Analysis

Plaintiff NCSI argues that it is entitled to summary judgment on its breach of contract claim under both Texas and New York law. Defendant points out that the contract has a choice of law provision providing that New York law controls. Dkt No. 12-2, SPA ¶ 10.1. Under New York law, the elements for a breach of contract cause of action are as follows: (1) formation of a contract

between the parties: (2) performance by plaintiff; (3) defendant's failure to perform; and (4) resulting damage. *Kausal v. Educational Prods. Info. Exch. Inst.,* 105 AD3d 909, 910 (2d Dept 2013), *appeal dismissed,* 21 NY3d 1039 (2013); *Palmetto Partners LLP v. AJW Qualified Partners, LLC*, 83 AD3d 804, 921 N.Y.S.2d 260 (2d Dep't 2011); *see also, Furia v. Furia*, 116 A.D.2d 694, 498 N.Y.S.2d 12 (2d Dep't 1986). Under Texas law the elements of breach of contract are the same. *Dorsett v. Cross*, 106 S.W.3d 213, 217 (Tex. App. — Houston [1st Dist.] 2003, pet. denied) (stating that the elements of a breach of contract are: (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach).

In the motion for summary judgment, NCSI argues that Staffing 360 breached the SPA because it did not calculate the "Deferred Tax Benefit" as required by SPA ¶ 2.7 by March 31, 2014, and pay fifty percent (50%) of that amount to NCSI by April 15, 2014. It contends that as a result, Staffing 360 immediately owed it an "Adjustment Amount" of over $1 million, instead of a long-term "Earn Out" based on CSI's gross profits. As supporting evidence, it relies upon the SPA, and upon the Affidavit of Charles Cooper. Dkt. No. 12, Exs. A and B. Cooper states "360 Solutions never calculated the amount of the Deferred Tax Benefit. Further 360 Solutions never made payment of of 50% of the Deferred Tax Benefit to NCSI." Dkt. No. 12, Ex. A at ¶ 6.

Staffing 360 argues that NCSI cannot prevail on its motion because there are genuine issues of material fact regarding whether it breached the SPA. Staffing 360 asserts that, to the best of its ability and with the information NCSI would make available to it, it *did* calculate the "Deferred Tax Benefit" by March 31, 2014, but that its calculation showed that the benefit due was zero. Staffing 360 asserts that fact issues exist regarding whether its calculation was correct, and whether its computation met the "reasonably finalize" standard set forth in SPA ¶ 2.7, issues which require resolution at trial. In support of this argument, Staffing 360 offers the affidavit of its Chief Financial

Officer, Jeff Mitchell, accompanied by various exhibits. Dkt. No. 13-2. Mitchell testifies that Cooper e-mailed the Staffing 360 Controller, Nick Koutsivitis, on March 24, 2014, reminding him about the upcoming March 31, 2014, deadline to calculate the "Deferred Tax Benefit" due under the SPA, and that Koutsivitis forwarded the e-mail to him. Cooper's e-mail to Koutsivitis stated "I have asked Wolf to generate this number, but I don't know if you want to use them or someone else." Dkt. No. 13-2, Mitchell Aff., Ex. G.[2] Mitchell testified that the documentation sent to Wolf was not available to him at the time the calculation was due under the SPA. Dkt. No. 13-2, Mitchell Aff. at ¶ 31.

Mitchell further testifies that as an experienced public company CFO, he has familiarity with the concept of "deferred tax assets" because of his experience with GAAP accounting and financial reporting under the standards set by the Financial Accounting Standards Board. *Id.* at ¶ 32. In particular, he testifies audited financial statements of public companies generally include an analysis of the impact of deferred income tax assets and liabilities on the balance sheet under ASC 740 (formerly FAS 109). *Id*. Consistent with this, "Note 14, Income Taxes," to Staffing 360's Audited Financial Statements annexed to the Form 10-K filed with the Securities and Exchange Corporation for the fiscal year ended May 31, 2014, discusses "deferred tax assets" as applied to the parent corporation:

> ASC 740 requires the recognition of deferred tax assets and liabilities for both the expected impact of differences between the financial statements and the tax basis of assets and liabilities, and for the expected future tax benefit to be derived from tax losses and tax credit carry forwards.

*Id.* at ¶ 33; Dkt. No. 13-2, Mitchell Aff., Ex. D. On the balance sheet, deferred tax assets and liabilities are always netted. *Id.* at ¶ 33; Dkt. No. 13-2, Mitchell Aff. Mitchell further testified that

---

[2]"Wolf" refers to the accounting firm Wolf & Company, P.C. Dkt. No. 13-2, Exh. G at 9.

ASC 740 provides for an additional, related concept, the "valuation allowance," which requires the Company to determine whether it is "more likely than not" to ever realize the benefit of the deferred tax assets. *Id.* at ¶ 34; Dkt. No. 13-2, Mitchell Aff., Ex. D. A full valuation allowance reduces the deferred tax asset to zero. *Id.* Mitchell testified that in the fiscal years ending May 31, 2012, 2013 and 2014, Staffing 360 recognized a full valuation allowance—meaning that the deferred tax assets for those years was zero. *Id.* at ¶¶ 34-35.

Mitchell sent an e-mail to Cooper at 2:44 p.m. on March 28, 2014, with a copy to Koutsivitis, as well as the two other NCIS shareholders (Simon Dealy and Margaret Gesualdi), that stated:

> I think the purpose of this clause was basically to say, if there is a tax benefit to the parent, 50% of that benefit will be paid to you guys in cash. While I would be interested in seeing Wolf's calculation to see what they say, I think the question is what or how can the parent benefit from the purchase tax asset. I don't think that we will know that until year-end but I am happy to discuss with you.

Dkt. No. 13-2, Mitchell Aff., Ex. I.

Mitchell further states that to calculate the "Deferred Tax Benefit," he relied on unaudited financial statements from CSI's accounting department for the period ending February 28, 2014. *Id.* at ¶ 37; Dkt. No. 13-2, Mitchell Aff., Ex. E. Although SPA ¶ 2.7 provided that the calculation was to be as of the Closing Date (November 4, 2013), and NCSI was required to file tax returns for CSI as of the Closing Date, it had not yet done so, and the schedules that are customarily prepared in connection with that filing were not available to Staffing 360. *Id.* at ¶ 37. Mitchell testified that with the limited information available to him at the time, he calculated the "Deferred Tax Benefit" as best he could, and that he e-mailed all three shareholders of NCSI on March 28, 2014 at 4:35 p.m., with his calculation. In that e-mail, Mitchell refers to SPA ¶ 2.7 and states:

> The Company does not review or estimate its deferred tax position other than on an annual basis. However, as I [sic] result of this requirement in the purchase agreement, I did take a quick look at the beginning balances acquired through the acquisition. Based upon my review, it appears that CSI may have actually had a "Deferred Tax

7

> Liability" rather than a "Deferred Tax Asset" at the time of purchase.  The amounts that I see on the books are as shown below:
>
> | Account | 11/3/13 |
> |---|---|
> | Deferred Tax Asset | ($26,778) |
> | Deferred Tax Liability | ($62,000) |
> | Total Deferred Tax Liability | ($88,778) |
>
> To me this would appear that there is actually some tax exposure/liability that has accrued. I don't know the in's/out's of what is in this number at the current time but I would suggest that we defer this topic appropriately to year-end when we go through the formal process of tax returns, audited financials, etc. when we evaluate the positive or negative impact of this clause.  Our year end is 5/31/14.

Dkt. 13-2, Mitchell Aff., Exhibit F.  On March 31, 2014, the date the computation and payment were due, Cooper e-mailed Mitchell.  He stated:

> Nice to make your acquaintance, if only by email so far. We will need to speak to our advisors and then get back to you later in the week. I have been on a plane to San Francisco since early this morning and only now had connectivity.  For clarity, however, the agreement speaks to S360 paying 50% of any deferred tax asset, not the net of any deferred tax asset and deferred tax liability. That was deliberate and highly negotiated as part of the overall deal. Speak with you soon.

Dkt. No. 13-2, Mitchell Aff., Ex. H.  Mitchell responded:

> Once you have spoken to your advisor, I would be happy to get on a call with you (individually or collectively) with the advisor to have a discussion.  My position at this point is simply from an evaluation and fact finding to make sure that we all understand the facts and do the right thing.  Just at first glance of the balance sheet at the time of purchase, it appears that both your Tax Asset account AND your Tax Liability account had credit balances that would make them both liabilities. So once you track down your advisor, ring me up and let's discuss.

Dkt. No. 13-2, Mitchell Aff., Ex. I.

Mitchell maintains that he tried to work with the NCSI Shareholders over the next month to gather additional information for the computation and his additional attempts indicated there was no "Deferred Tax Asset" as of November 30, 2013. Dkt. No. 13-2, Mitchell Aff. at ¶ 49; Ex. J.  On April 9, 2014, Cooper sent out an e-mail with Wolf's analysis.  That e-mail stated:

8

> As you are aware, the Stock Purchase Agreement with NewCSI calls for S360 to pay to NewCSI 50% of the Deferred Tax Assets that accrue to the benefit of CSI or S360 as of the Closing Date. In prior e-mail exchanges, Jeff indicated that S360 had not generated the analysis but that S360 would be happy to review whatever our advisors generated. That analysis produced the following amounts of Deferred Tax Assets and the Amount Due to CSI on 4/20/14
>
> | | |
> |---|---|
> | Canadian Deferred Tax Assets | $ 67,337 (CDN) |
> | US $ Amount at frx of .9039 | $ 60,866 |
> | US Deferred Tax Assets Total | $248,000 |
> | Total Deferred Tax Assets | $308,866 |
> | Due to NewCSI at 50% | $154,433 |
>
> Of the $154,433 due to NewCSI, S360 will be receiving a cash refund in the amount of $48,961 sometime in the near future, with the remaining amount available as a loss carryforward. The US Deferred Tax Assets will offset US tax liabilities and should be accrued on the CSI's books as per the Wolf spreadsheet. I have attached the following backup for your review: a) spreadsheet from Wolf for the US Deferred Tax Assets (blue highlights show the specific assets and amounts); b) the Canadian tax return filed for the period ending 11/3/2014 prepared by Harris & Partners (Canadian CPAs); c) copy of frx rate for 3/31/14; d) email from Ian Rothman explaining the amount that will be refunded in cash to CCSI.

Dkt. No. 13-2, Mitchell Aff., Ex. K.

Staffing 360 contends that Mitchell and his staff had difficulty making the "Deferred Tax Benefit" computation because SPA ¶ 2.7's language is ambiguous and because of a lack of timely and complete information from NCSI. In support, Staffing 360 offers the affidavit of Mitchell and the affidavit of Robert Wellen, a tax attorney with an LLM in taxation, who it hired as an expert. Dkt. No. 13-1, Ex. A. Staffing 360 argues that under accepted accounting principles, there are different methods by which a "Deferred Tax Benefit" or "Deferred Tax Asset" can be calculated; and that therefore fact issues exist as to whether SPA ¶ 2.7 is ambiguous and whether performance of ¶ 2.7 was even possible. *Id.*

9

The Court agrees that there are fact issues precluding summary judgment in this case. Notably, "Deferred Tax Assets" is not defined anywhere in the SPA. Mitchell testified that in April 2014, using Generally Accepted Accounting Principles ("GAAP"), and using CSI's documentation, he netted the deferred tax asset account and the deferred tax liability account and again determined that no money was owed pursuant to SPA ¶ 2.7. Dkt. 13-2, Mitchell Aff., Ex. J. Cooper and NCSI disagree, contending that the amount due was $154,433. Staffing 360 also hired its own tax professional to attempt to calculate the "Deferred Tax Asset" using the information provided, and she arrived at yet a different calculation of the amount owed. Dkt. 13-2, Mitchell Aff., Ex. P. Staffing 360 also emphasizes that under ¶ 2.7, its obligation was to "reasonably finalize the dollar value of Deferred Tax Assets" and pay 50% of that amount to NCSI at the next scheduled Earn Out date. It contends that Mitchell's actions communicating with NCSI shareholders, gathering data, and communicating his view that no payment was due meets the standards of this paragraph. NCSI does not dispute that Mitchell e-mailed it on March 28, 2014, informing it that under his interpretation, no monies were due under SPA ¶ 2.7. Cooper's response was to suggest that there should not be a "netting" of deferred tax liabilities, and to state that he was having an accounting firm look at the issue. Because there are fact issues regarding whether Staffing 360 "reasonably finalized" its calculation by March 31, 2104, and regarding whether its calculation was correct, summary judgment is inappropriate.

Alternatively, there is a serious question regarding whether the term "Deferred Tax Asset" is ambiguous. In his affidavit, Mitchell catalogues well all of the uncertainties with ¶ 2.7:

- The term "Deferred Tax Asset" is capitalized in the SPA, but it is not defined in SPA ¶ 2.7, in SPA Article I (Definitions) or anywhere else in the SPA.

- It isn't clear to me what "reasonably finalize" means, and there isn't a mechanism in the SPA to work out differences if the amount could not be "reasonably finalized" before the payment date, April 20, 2014, or if there was a disagreement over the amount.

- The date to measure the "Deferred Tax Assets" is as of the "Closing Date," or November 4, 2013. However, the timing for performing the computation is "90 days after December 31, 2013," or March 31, 2014. There isn't any provision for an extension if CSI had not made the underlying financial information available to Staffing 360.

- ln my experience, when calculating deferred tax assets for financial statements, you net "'deferred tax liabilities." SPA ¶ 2.7 does not speak to whether the computation includes, as would be customary practice, such netting.

- SPA ¶ 2.7 includes as a defined term "Deferred Tax Benefits." However, it is not clear how, if at all, this term differs from "Deferred Tax Assets."

- SPA ¶ 2.7 states the calculation should be "without regard as to whether or not such Deferred Tax Asset has been or can be used in the current tax year or is deferred to a future year." SPA¶ 2.7 is silent about the consequences should Staffing 360 determine that it is not likely to *ever* receive the benefit of, after netting, the Deferred Tax Asset. Under GAAP accounting, when a company believes that "'the benefit is more likely than not to ever be realized," it recognizes a "valuation allowance," which reduces the deferred tax asset to zero

Dkt. No. 13-2 at ¶ 36.

Whether a contract is ambiguous is a question for the court to resolve and ambiguity is present if language is written so imperfectly that it is susceptible to more than one reasonable interpretation . *Dobbs v. North Shore Hematology–Oncology Assoc., P.C.*, —— AD3d ——, 2013 N.Y. Slip Op 03295 [2d Dept .2013]. *See also Telerep, LLC v. U.S. Int'l Media, LLC*, 74 AD3d 401 (1st Dept. 2010) ("A contract is ambiguous if on its face it is reasonably susceptible of more than one interpretation."). "When the language of a contract is ambiguous, its construction presents a question of fact that may not be resolved by the court on a motion for summary judgment." *Shadlich*

*v. Rongrant Assoc., LLC*., 66 A.D.3d 759, 760, 887 N.Y.S.2d 228; *see generally Vale v. 221 Thompson, LLC*, 82 A.D.3d 754, 917 N.Y.S.2d 902; *County of Orange v. Carrier Corp.*, 57 A.D.3d 601, 602, 869 N.Y.S.2d 211).  Given that the capitalized term "Deferred Tax Asset" is not defined by the contract, there is a legitimate question regarding whether it should be read consistently with GAAP rules, or if NCSI's reading of it is correct.[3]  Such an ambiguity—going to the heart of the dispute here—precludes summary judgment.

Finally, there is a fact dispute regarding whether NCSI frustrated Staffing 360's calcuation of the amount due by not making the relevant data available to Staffing 360.  Under New York law,"[A] party to a contract cannot rely on the failure of another to perform when he has frustrated or prevented the performance." *Hidden Meadows Dev. Co. v. Parmelee's Forest Prods.*, 289 A.D.2d 642, 644 (3d Dept. 2001); *see also Tacon Mech. Contractors, Inc. v. Grant Sheet Metal, Inc.*, 899 S.W.2d 666, 670 (Tex.App.–Houston [14th Dist.] 1994, writ denied) ("When one party to a contract, by wrongful means, prevents the other party from performing, this interference with performance constitutes breach of contract.").  Mitchell testified that NCSI's and CSI's financial statements and tax returns were in the control of NCSI and not Staffing 360. Dkt. No. 13-2, Mitchell Aff. ¶ 30.  He testified that his staff used unaudited financial statements from CSI's accounting department for the period ending February 28, 2014, to make the calculation.  Indeed, as of the calculation date, NCSI had not completed tax returns for CSI as of the Closing Date, and the schedules customarily prepared prior to the tax filing were not available.  *Id.* at ¶ 37. Mitchell further testified that the information

---

[3]Cooper's response to Mitchell's email on March 28, 2014, claimed that "the agreement speaks to S360 paying 50% of any deferred tax asset, not the net of any deferred tax asset and deferred tax liability. That was deliberate and highly negotiated as part of the overall deal." Dkt. No. 13-2, Mitchell Aff., Ex. H.

NCSI provided to its own accountant (Wolf) was not given to Staffing 360 so that it could make a separate calculation of money potentially owed.  *Id.* at ¶ 52.  NCSI has not replied to these contentions or offered evidence to the contrary.  Accordingly, fact issues exist as to whether any failure by Staffing 360 to calculate "Deferred Tax Assets" by March 31, 2014, is excused by NCSI's failure to provide it with the necessary information to perform the calculation.

## III.  RECOMMENDATION

Based upon the foregoing, the undersigned Magistrate Judge **RECOMMENDS** that the Court **DENY** Plaintiff NewCSI, Inc.'s Motion for Summary Judgment (Dkt. No. 12).

## IV.  WARNINGS

The parties may file objections to this Report and Recommendation.  A party filing objections must specifically identify those findings or recommendations to which objections are being made.  The District Court need not consider frivolous, conclusive, or general objections.  *See Battle v. United States Parole Comm'n*, 834 F.2d 419, 421 (5th Cir. 1987).

A party's failure to file written objections to the proposed findings and recommendations contained in this Report within fourteen (14) days after the party is served with a copy of the Report shall bar that party from *de novo* review by the District Court of the proposed findings and recommendations in the Report and, except upon grounds of plain error, shall bar the party from appellate review of unobjected-to proposed factual findings and legal conclusions accepted by the District Court.  *See* 28 U.S.C. § 636(b)(1)(c); *Thomas v. Arn*, 474 U.S. 140, 150-53, 106 S. Ct. 466, 472-74 (1985);  *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc).

To the extent that a party has not been served by the Clerk with this Report & Recommendation electronically pursuant to the CM/ECF procedures of this District, the Clerk is directed to mail such party a copy of this Report and Recommendation by certified mail, return receipt requested.

SIGNED this 29th day of March, 2015.

_____
ANDREW W. AUSTIN
UNITED STATES MAGISTRATE JUDGE