IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| NEWCSI, INC., | § | |
| | § | |
| v. | § | A-14-CV-557-LY |
| | § | |
| STAFFING 360 SOLUTIONS, INC. | § | |

**ORDER**

Before the Court is Defendant's Motion to Set Amount of Supersedeas Bond (Dkt. No. 117); Plaintiff's Response (Dkt. No. 126); Defendant's Reply (Dkt. No. 139); Plaintiff's Supplemental Brief (Dkt. No. 154); and Defendant's Response (Dkt. No. 153). The motion has been referred to the undersigned for disposition. (Dkt. No. 135). The Court heard argument on the motion on January 21, 2016.

**I.   Procedural posture**

This case was tried to a jury from May 14, 2015, through May 21, 2015. The jury returned a verdict favorable to Plaintiff NewCSI, Inc., ("NCSI"), and after a good deal of post-trial briefing, Judge Yeakel entered judgment on the verdict on October 21, 2015, awarding NCSI $1,306,576 in damages, and $77,186.50 in prejudgment interest. NCSI thereafter filed a motion requesting attorney's fees, which was referred to the undersigned for Report & Recommendation. On January 15, 2016, the undersigned recommended that NCSI recover $504,729.27 in fees. (Dkt. No. 141). That recommendation is pending before Judge Yeakel.

On December 18, 2015, Defendant Staffing 360 Solutions, Inc., ("Staffing 360") filed a motion asking that the Court permit it to file a supersedeas bond in an amount less than the judgment, and seeking a temporary stay of execution while the Court considered that motion. NCSI responded, asking the Court to strike Staffing 360's motion, and alternatively addressing the merits of Staffing 360's request. On January 7, 2016, Judge Yeakel denied both Staffing 360's motion for a temporary stay of execution, and NCSI's motion to strike Staffing 360's request for a reduced supersedeas bond, and

referred the issue of the amount of the bond to the undersigned for disposition. Prior to this, NCSI served post judgment discovery on Staffing 360, and on MidCap Financial Trust, one of Staffing 360's lenders. On December 7, 2015, Staffing 360 sought to quash the subpoena served on MidCap, contending that it seeks information that is irrelevant to discovering assets that could be used to satisfy NCSI's judgment. ( Dkt. No. 104). On December 16, 2015, NCSI filed an Application for Turnover Relief and Appointment of a Turnover Receiver (Dkt. No. 112), for the purpose of attempting to execute on the judgment. Staffing 360 opposes that motion. Finally, on January 6, 2016, Staffing 360 filed its notice of appeal of the judgment entered on October 21, 2015. (Dkt. No. 127).

## II.   Legal Principles

Under Federal Rule of Civil Procedure 62(d), an appellant is entitled to a stay of execution of judgment as a matter of right if the appellant posts a supersedeas bond. FED. R. CIV. P. 62(d). "The purpose of a supersedeas bond is to preserve the status quo while protecting the non-appealing party's rights pending appeal." *Poplar Grove Planting and Refining Co. v. Bache Halsey Stuart, Inc.*, 600 F.2d 1189, 1190 (5th Cir. 1979). The bond is intended to secure the non-appealing party "against any loss sustained as a result of being forced to forgo execution on a judgment during the course of an ineffectual [appeal]." *Id*. at 1191. Put another way, "the rationale for requiring a bond pending appeal is to secure the judgment throughout the appeal process against the possibility of the judgment debtor's insolvency." *Grubb v. FDIC*, 833 F.2d 222, 226 (10th Cir. 1987) (citing *Poplar Grove*).

Although Rule 62(d) does not define the amount and conditions of a supersedeas bond, it has been read consistently with the earlier version of the rule (former Rule 73(d)) to require the appealing party to post a bond for the full amount of the judgment, plus costs of appeal, interest and any estimated damages attributed to the delay. *Poplar Grove,* at 1191. While the district court has the power to waive the supersedeas bond requirement, that power "has been exercised only in

'extraordinary circumstances,' and only where alternative means of securing the judgment creditor's interest were available." *Grand Entm't Grp., Ltd. v. Star Media Sales, Inc.*, 1992 WL 114953, at *2 (E.D. Pa. May 18, 1992). In *Poplar Grove*, the Fifth Circuit identified two situations that would merit departure from the ordinary requirement of posting a bond for the full amount of the judgment: (1) when "a judgment debtor objectively demonstrates a present financial ability to facilely respond to a money judgment and presents to the court a financially secure plan for maintaining that same degree of solvency during the period of an appeal," or (2) when "the judgment debtor's present financial condition is such that the posting of a full bond would impose an undue financial burden" and the court could "fashion some other arrangement for substitute security through an appropriate restraint on the judgment debtor's financial dealings, which would furnish equal protection to the judgment creditor." *Poplar Grove,* at 1191. The burden is on the moving party, in this case Staffing 360, "to objectively demonstrate the reasons for such a departure." *Id.*

### III.   Analysis

At the hearing on the motion, the Court received into evidence two exhibits, and heard the testimony of Matthew Briand, Staffing 360's Chief Executive Officer and President. Mr. Briand testified largely from Staffing 360's recent 10-Q filing with the SEC, which was admitted as Exhibit 1 at the hearing. (Dkt. No. 151-1). He stated that Staffing 360 has an accumulated deficit of $39 million, and cash on hand of approximately $1 million. He stated that Staffing 360 does not, without borrowing, have the ability to post a supersedeas bond of $1.4 million or more, and he opined that while it is was possible that it could obtain a loan for as much as $650,000, he felt certain that Staffing 360 could not get a loan for as much as $2 million, the rough amount of the judgment plus attorney's fees. He further stated that Staffing 360 and its subsidiaries have many loans outstanding, which are collateralized with the assets of the company or its subsidiaries. He noted, for example, that Staffing 360's primary lender, MidCap Financial Trust, has a lien on all of Staffing 360's assets

or personal property. From this evidence, Staffing 360 argued that NCSI was not in a position to collect on its judgment at this time regardless of a stay, as all of Staffing 360's assets are pledged to other creditors, and NCSI would not be harmed by a reduced supersedeas bond of $650,000. In fact, Staffing 360 contended that NCSI would be better off with such a bond, as it would be guaranteed to collect that amount should Staffing 360's appeal fail, which is more than it would likely obtain from executing on the judgment at this time or while the appeal is pending.

NCSI disagrees with Mr. Briand's characterization of Staffing 360's present financial affairs. It notes that just two weeks after the judgment was entered, Staffing 360 closed an acquisition in which it made a cash payment of $1.15 million. (Dkt. No. 112-1). It points out that the most recent 10-Q filing reflects that Staffing 360 has over $22 million in accounts receivable, while its debt on those receivables is reflected as $14,788,000.[1] (Dkt. No. 151-1 at 3). Further, the notes to the financial statements indicate that Staffing 360 has access to nearly $30 million in lines of credit from at least three lenders. Specifically, the 10-Q reports that affiliate Staffing U.K. has a £3.5 million line of credit with ABN AMRO Commercial Finance PLC. *Id.* at 32.[2] The 10-Q states that the loan allows Staffing U.K. to "borrow money against open accounts receivable." *Id.* In addition, four of Staffing 360's wholly-owned subsidiaries (Monroe Staffing Services, Peopleserve, Inc., Lighthouse, and Faro Recruitment America) are borrowers under a $22 million line of credit with MidCap

---

[1] Staffing 360 objected to NCSI's filing of a supplemental brief after the hearing, in which NCSI cites to the 10-Q to support its position. Staffing 360 contends that the 10-Q was publicly available a week before the hearing, and NCSI should have raised the points earlier. While the 10-Q may have been filed with the SEC a week before the hearing, it was not submitted as evidence in support of Staffing 360's motion until the hearing. Given that Staffing 360 has the burden of proof on this issue, NCSI had no reason to address the document until Staffing 360 offered it at the hearing. Regardless, the Court itself had noted all of these points in reviewing the 10-Q after the hearing, and Staffing 360 has responded to the supplement. As the supplemental brief has not prejudiced Staffing 360, the Court will permit it.

[2] At current exchange rates £3.5 million is $4.98 million.

Funding X Trust, and those entities have an option to increase the line to $47 million. *Id.* at 33. The line of credit is described as a "revolving loan facility," and while the 10-Q contains a detailed description of the events of default and affirmative and negative covenants, there is no mention of any limit on Staffing 360's use of funds drawn under the line. *Id* Finally, the 10-Q reports that Staffing 360 subsidiary PRS has a $3 million line of credit with MidCap, which is described in the same terms as the preceding line. *Id.* at 34.

In addition to available lines of credit, the information in the 10-Q suggests that the overall value of Staffing 360's assets significantly exceeds the debt that is secured by those assets. Specifically, the 10-Q reports that Staffing 360's total current (tangible) assets are valued at $26.8 million, while the total secured debt appears to be $14.8 million in accounts receivable borrowing, *id.* at 34, and $4.47 million due on three (presumably secured) promissory notes, *id.* at 26-27, for a total of $19.27 million in debt.[3] This leaves a positive balance of $7.1 million. From this, NCSI asserts that executing on the judgment would not be as futile as Staffing 360 suggests. Staffing 360 disagrees, and in its response to NCSI's supplemental brief, it states:

> NewCSI's claim that Staffing 360 could immediately clear more than $7 million by simply collecting $26.8 million in accounts receivable and paying down $19.1 million in secured debt is simply wrong. NewCSI's "calculation" of Staffing 360's secured debt is contrary to the evidence presented at the hearing, where Mr. Briand testified that MidCap Financial possessed a security interest in "all assets and all personal property of Debtor, whether now owned or hereafter acquired, including all products and proceeds of the foregoing."

---

[3] NCSI's brief lists this figure as $19.1 million, using the $14.8 million accounts receivable figure, and $3 million and $1.35 million, respectively, as loan amounts to MidCap, citing pages 26 and 34 of the 10-Q. (Dkt. No. 154 at n.5). It appears that the $3 million loan NCSI referenced on page 34 of the 10-Q is actually a line of credit, as discussed in the text, *supra*, and is part of the $14.8 million accounts receivable financing package. There are, however, three term loan promissory notes described in the 10-Q, which collectively have balances totaling $4.47 million. (Dkt. No. 151-1 at 26-27) (describing two MidCap term loans, and one ABN AMRO term loan).

(Dkt. No. 153 at 2-3). This misunderstands the argument. MidCap is only secured up to the amount of its debt, which appears to currently be $18.1 million (ABN AMRO is the lender on an additional $1.15 million note). So NCSI is correct that if a receiver were to hypothetically seize Staffing 360's assets and sell them for their stated $26.8 million value, the receiver could retire all of Staffing 360's debt to MidCap and ABN AMRO, and still have more than $7 million left.[4] To put it another way, it does not appear that NCSI's "'calculation' of Staffing 360's secured debt is contrary to the evidence presented at the hearing." Reviewing the 10-Q, and reading it liberally, the secured debt appears to be only that owed to MidCap and ABN AMRO on lines of credit secured by accounts receivable—which the 10-Q reports to be $14,788,000—and that owed to MidCap and ABN AMRO on three term loans—which the 10-Q lists as having current balances totaling $4,468,040.[5] If Staffing 360 has other secured debt, it is not apparent from the 10-Q, and there is no evidence in the record of it.

Given this evidence, the Court cannot conclude that Staffing 360 would suffer significant financial harm if it were required to post a full superseadeas bond. In fact, the best that the Court can do on this point is speculate, as that is all that the evidence before the Court allows it to do. Despite the fact that Judge Yeakel entered judgment more than three months ago, Staffing 360 does not appear to have taken any concrete steps toward actually obtaining a bond; if it has, no evidence of what those steps were, and what they led to, is before the Court. Though Mr. Briand stated

---

[4]This of course assumes that the asset values would not be adversely affected by a receiver seizing them—something that is unlikely.

[5]The liberal part of the reading is assuming the three term notes are secured, as the 10-Q does not state this one way or the other. Given, however, that the lenders are MidCap and ABN AMRO, it is likely that the notes are secured. This is also consistent with the UCC filing records submitted as Exhibit 2 at the hearing. *See* Dkt. No. 151-2.

6

categorically that Staffing 360 could not post a full bond, the financial details contained in the recent 10-Q, and discussed above, suggest otherwise. And although he stated he did not believe that Staffing 360 could secure a loan for the amount of a full bond, that was at best his educated guess, as there is no evidence that Staffing 360 has actually pursued a loan for the full amount of a bond despite having had three months to do so. The burden of proof to obtain a reduced supersedeas bond is on Staffing 360. As the Fifth Circuit explained in *Poplar Grove*, lowering the amount of a bond is the exception to the rule, and is only appropriate when the court "fashion[s] some other arrangement for substitute security through an appropriate restraint on the judgment debtor's financial dealings, which would furnish *equal protection* to the judgment creditor." *Poplar Grove*, 600 F.2d at 1191 (emphasis added). Staffing 360 has offered no "restraint on [its] financial dealings" and has made no proposal that offers NCSI protection equal to a full supersedeas bond.

Further, Staffing 360 has failed to offer the Court any evidence of what the cost of a full bond procured from an insurance company would be. Mr. Briand testified that he was relatively confident that Staffing 360 could raise $650,000 in cash to post as a bond. But instead of posting those funds with the Court, Staffing 360 could instead use those funds (or some portion of them) to pay the premium for a supersedeas bond purchased from an insurance company—assuming the premium was $650,000 or less. The lack of any evidence of the cost of a supersedeas bond is another reason that the Court concludes that Staffing 360 has failed to carry its burden of proving its current financial condition is such that posting a full superseadeas bond would cause it undue financial harm.

**IV.   Conclusion**

The Court therefore **DENIES** Defendant's Motion to Set Amount of Supersedeas Bond (Dkt. No. 117). If Staffing 360 desires to secure a stay of NCSI's right to execute on the judgment in this

case, it must post a supersedeas bond in the full amount of the judgment, costs, and applicable post-judgment interest.

The Court will reserve ruling on NCSI's Application for Turnover Relief and Appointment of a Turnover Receiver (Dkt. No. 112) for 14 days from this date. If no bond has been posted by that date, the Court will move forward with that request.

SIGNED this 26th day of January, 2016.

_____
ANDREW W. AUSTIN
UNITED STATES MAGISTRATE JUDGE